# In the United States Court of Federal Claims

No. 14-437C
(Filed:  February 27, 2015)

|  |  |
|---|---|
| TWANYA L. BRASS, | ) |
| Plaintiff, | ) |
| v. | ) Military Pay; Wounded Warrior Act; |
|  | ) Physical Disability Board of Review; |
| THE UNITED STATES, | ) 10 U.S.C. § 1216a |
| Defendant. | ) |

*Wayne I. Pollock*, Philadelphia, PA, for plaintiff.  *Edwin V. Woodsome, Jr.* and *Anna Do*, Los Angeles, CA, and *Barton F. Stichman*, *Thomas A. Moore*, *David M. Sonenshine*, and *E. Lane Thompson*, National Veterans Legal Services Program, Washington, DC, of counsel.

*William P. Rayel*, Civil Division, United States Department of Justice, with whom were *Joyce R. Branda*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch.  *Lt. Matthew Roush*, United States Navy, Washington, DC, of counsel.

**O P I N I O N**

*Firestone*, Judge.

This case deals with the United States Department of the Navy's ("the Navy") decision to reject the 2012 recommendation of the Physical Disability Board of Review ("PDBR"), undertaken pursuant to the Wounded Warrior Act of 2008, to increase the plaintiff's disability award.  Plaintiff Twanya L. Brass ("Ms. Brass") alleges in her complaint that the Navy erred when it failed to accept the recommendation of the PDBR

to increase from 10% to 30% the disability rating she received from the Navy when she was discharged in 2008.  The difference between these two ratings is large: the 10% rating entitled Ms. Brass to a one-time payment of $51,414, while a 30% rating would entitle her to monthly disability payments, medical care for life, and military commissary and exchange privileges.

Pending before the court are the motion for judgment on the administrative record filed by defendant The United States ("the government") and the cross-motion for judgment on the administrative record filed by plaintiff.  In its motion, the government argues that the Navy's 2012 decision to reject the PDBR recommendation to increase her disability rating was lawful and supported by substantial evidence.  Plaintiff, in her motion, argues that the Navy's decision to reject the recommendation was arbitrary, capricious, and not in accordance with law.

For the reasons set forth below, plaintiff's motion is **GRANTED-IN-PART** and **DENIED-IN-PART**, the government's motion is **DENIED**, and the case is **REMANDED** for further proceedings consistent with this opinion.

I.  BACKGROUND

    a.  **The Navy's Disability Evaluation Process and The Wounded Warrior Act**

Under the Navy Disability Evaluation Manual ("Navy manual"), the Navy has created "policies and procedures for evaluation of physical fitness for duty and disposition of physical disability in the [Navy] . . . ."  Secretary of the Navy Instruction ("SECNAVINST") 1850.4E ¶ 1.  This process has several steps.  First, when a service

member's ability to perform his or her duties is called into question as a result of a mental or physical impairment, a Navy Medical Evaluation Board ("MEB") is convened "to evaluate and report on the diagnosis; prognosis for return to full duty; plan for further treatment, rehabilitation, or convalescence; estimate of the length of further disability; and medical recommendation for disposition of such members." Id. at Enclosure 2, § 2043.

If the MEB finds a "member's fitness for continued naval service questionable by reason of physical or mental impairment," the process proceeds to a second step: a Navy Physical Evaluation Board ("PEB"). Id. at Enclosure 3, § 3201(a).  The PEB acts on behalf of the Secretary of the Navy and makes determinations of fitness to continue naval service, entitlements to benefits, and disposition of service. Id. at Enclosure 1, § 1004(a). An informal PEB first performs a record review and issues preliminary findings. Id. at § 1004(b).

If the member disagrees with those findings, she may request a formal hearing. Id. at § 1004(c)-(d). The formal PEB will then conduct a hearing and make recommended findings to the President of the PEB, who will issue a final determination. Id. at § 1004(f). Alternatively, the member may accept the findings of the informal PEB, waive the formal PEB and, if found to be unfit, request a discharge date. See id. at § 1004(c)(3); AR 37-38. According to the Navy manual, "[t]he sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of the office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay." SECNAVINST 1850.4E,

Enclosure 3, § 3301.  If a member is determined to be unfit for duty based upon one or more disabilities, those unfitting conditions will be assigned a percentage rating pursuant to the standards established by the Veterans Administration Schedule for Rating Disabilities ("VASRD").  Id. at § 3801-3802; 10 U.S.C. § 1216a(a).

In 2008, Congress passed the Wounded Warrior Act, which clarified that in making a disability determination the Secretary of the branch concerned is authorized to apply criteria in addition to the VASRD "if the utilization of such criteria will result in a determination of a greater percentage of disability than would be otherwise determined through the utilization of the schedule."  10 U.S.C. § 1216a(a)(2).  The Wounded Warrior Act also established the PDBR to review disability determinations for "covered individuals" who were separated from the military between September 11, 2001 and December 31, 2009 due to a medical condition with a disability rating of 20% or less, and found not eligible for retirement.  10 U.S.C. § 1554a(a)-(b).  Covered individuals are authorized to petition the PDBR to review the findings and decisions of a PEB based upon existing military records and other evidence presented.  Id. at § 1554a(c)(1)-(2).  Following its review, the PDBR "may . . . recommend to the Secretary concerned" changes to the covered individual's disability rating and status.  Id. at § 1554a(d).  The Wounded Warrior Act further provides that the Secretary concerned may correct the covered individual's military records in accordance with the PDBR recommendation or reject the PDBR recommendation.  See id. at § 1554a(e)(1); Department of Defense Instruction 6040.44, Enclosure 3, ¶ 6(d).  The Secretary is given final decision-making authority.

    **b.**    **Facts**

        **1.**    **Plaintiff's Naval Service and Medical History**

Ms. Brass served on active duty in the Navy from September 9, 1998 to May 31, 2008 as an Operations Specialist, reaching the rank of Second Class Petty Officer. AR 1361, 1430-85. In June 2006, Ms. Brass was assigned to the USS Mobile Bay, a guided missile cruiser. Id. at 1429. Shortly thereafter, in July 2006, Ms. Brass began to have difficulty at work. Id. at 1352. Around January 2007, she began to experience psychological symptoms, including depressed mood, low energy, irritability, thoughts of hurting others, and hypersomnolence. Id. at 86, 1352. In April 2007, an Independent Duty Corpsman referred her to the Psychiatry Clinic at Naval Branch Health Clinic Naval Station San Diego because she had expressed thoughts of hurting others, including coworkers and members of her immediate family. Id. at 1362.

A Navy doctor diagnosed Ms. Brass as suffering from Depressive Disorder NOS and assigned her a Global Assessment Functioning ("GAF") rating of 48. Id. at 558-59, 1347-50. Such a rating suggests some "serious impairment in social, occupational, or school functioning[.]" 34 American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision. As a result of this diagnosis, Ms. Brass was not considered fit for full duty and was placed on Limited Duty. Id. at 1350. This meant that she could not participate in deployments, night duties, or the handling of firearms or heavy machinery. Id. Additionally, Ms. Brass was referred to in-group and individual therapy. Id.

5

Ms. Brass participated in therapy from April 2007 through January 2008, see, e.g., id. at 554, 555, 1214, 1217, 1233, 1246, 1259, 1298, 1310, 1319, 1325, 1345, and was prescribed Wellbutrin to manage her symptoms, id. at 1302.  She began to show some improvement in June-October 2007, averaging GAF ratings of around 63.  Id. at 32, 1246, 1253, 1259, 1290, 1298, 1301, 1307, 1310, 1313, 1316, 1319.  In October 2007, Ms. Brass was re-evaluated to determine whether she was fit to return to full duty.  Id. at 1252-54.  While the doctor found that she reported an improvement in her depression, the doctor also noted that she had ongoing interpersonal issues at work and was having difficulty addressing those problems.  Id. at 1253.  The doctor reaffirmed the earlier diagnosis and found that Ms. Brass was still unfit for full duty.  Id.

### 2. MEB and PEB Evaluations

That same month, Ms. Brass was evaluated by a MEB, the first step in the disability evaluation process.  Id. at 26-33.  The MEB found that Ms. Brass had depressed mood with constricted ranging affect.  Id. at 26, 29.  In its report, the MEB found that, despite some improvements, plaintiff continued to complain about hypersomnolence, depressed mood, and low energy.  Id. at 26.  The examiner noted that her "personality structure has interfered with full recovery and is a factor of why she is unlikely to do well if returned to operational duty.  She has limited ability to cope and adapt to stressful events especially when related with interpersonal relationships.  Id. at 31.  The MEB recommended a medical discharge because of the "high likelihood of an exacerbation of symptoms in an operational environment," id., and recommended that the case be referred to a PEB for further proceedings, id. at 33.

6

On January 9, 2008, an informal PEB consisting of a Navy medical officer, a Marine Corps line officer, and a Marine Corps Reserve line officer was convened to evaluate Ms. Brass.  Id. at 40-41.  The PEB determined that her depressive disorder was an unfitting condition and assigned her a disability rating of 10%.  Id. at 40.  Later that month, Ms. Brass requested reconsideration of the determination, claiming that relevant information was not included in the medical records reviewed by the PEB.  Id. at 42-46.  Ms. Brass included her health records for April 2007 through November 2007 with her request.  Id. at 47-84.  Additionally, she demanded a formal PEB in the event that the second PEB did not change the determination to what she believed her condition warranted.  Id. at 45.[1]

On February 13, 2008, a second informal PEB, consisting of a Navy medical officer, a Navy Reserve line officer, and a Marine Corps Reserve line officer, was convened.  Id. at 35-36.  The results of this PEB were identical to the first, with the PEB determining a disability rating of 10%.  Id.  While Ms. Brass had earlier indicated that she would demand a formal PEB if the second informal PEB reached the same result, she accepted the result and waived her right to a formal hearing.  Id. at 38.

---

[1] Ms. Brass also sought a disability rating for other health-related problems, including migraine headaches.  See AR 35, 40.

In making its disability determination, the Navy applied its own manual interpreting the VASRD.[2] The VASRD provides the following standard for a 30% disability rating:

> Occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events).

38 C.F.R. § 4.130. The Navy manual provides the following gloss on the VASRD standard:

> Since the 30% rating in the VASRD requires ". . . intermittent periods of inability to perform occupational tasks," the following definition of vocational functional impairment is provided: Symptoms of a psychiatric condition causing a period or periods of "inability to perform occupational tasks" <u>should be of such severity as to result in a pattern of job loss, demotion, disqualification from obtaining employment, or inability to engage in or maintain reasonable employment</u>. "Reasonable employment" is determined, in part, by considering the service member's premorbid vocational adjustment, education, and accomplishments.

SECNAVINST 1850.4E, Enclosure 9 § 9011(k)(1)(b) (emphasis added). The Navy manual thus requires evidence of job loss, demotion or the inability to maintain employment in order to meet the "intermittent period of inability to perform occupational tasks" requirement in the VASRD.

### 3. VA Evaluation

---

[2] As noted above, under 10 U.S.C. § 1216a(a)(2), the Navy is permitted to apply its own standards so long as they do not impose a higher standard than that set in the VASRD.

Two months prior to leaving the Navy, on March 11 and 14, 2008, the VA conducted an evaluation of Ms. Brass. AR 114-15. The VA issued a rating decision, based on those evaluations and other evidence, on July 9, 2008. Id. The examiner diagnosed depressive disorder, noting that Ms. Brass reported "major depression and 14 hours of sleep a day" and found a GAF rating of 65. Id. at 115. The VA examiner noted that the effect of her depressive disorder also had an effect on her occupation and social functioning, which resulted in a 30% disability rating. Id. at 115-16. She was also evaluated for a disability based on migraine headaches, which was found to be 0% disabling. Id. at 129. On June 2, 2010, she sought a rating increase from the VA for migraine headaches and was examined again. Id. at 133. After this review, her rating was increased to the 10% level. Id. at 130. Several months later, on December 13, 2010, Ms. Brass was reevaluated for her depressive disorder. Id. at 22-25. Following that examination, the VA determined that Ms. Brass's disability rating for depression should continue at 30%. Id. The 2010 decision noted that Ms. Brass reported having insomnia and depression that caused difficulties with work. Id. at 149. The evaluation indicated that she had been unemployed for several years upon leaving the Navy and had been employed for less than one year in her current position. Id. at 148. The evaluation further stated that she had missed 3 weeks of work since starting the job because of her depressive symptoms, id. at 149, and that she did not expect her contract to be renewed, id. at 145. The examiner assigned a GAF rating of 55, noting a diagnosis of "Major Depression." Id.

      **4.**     **PDBR Review**

On October 11, 2011, Ms. Brass submitted an application to the PDBR for review of the Navy's 2008 10% disability rating determination. Id. at 19-22. The application stated that she "would like the findings of [her] PEB re-evaluated in accordance with the VASRD. According to the VA[S]RD and [her] medical records, at the time of discharge [she] should have been rated differently." Id. at 19. The PDBR convened on June 14, 2012. Id. at 13.

On June 29, 2012, the PDBR issued a written decision in which it recommended that Ms. Brass's disability rating "be recharacterized to reflect permanent disability retirement with a combined disability rating of 30% rather than 10%. Id. The 30% recommendation was based solely on her depression. The PDBR did not recommend any change with regard to the 0% rating attributable to her migraine headaches. The President of the PDBR informed the Assistant Secretary of this recommendation on the same day. Id.

The PDBR found that "the GAF assignments of 55, and 65, symptom description, and clinical course argue against a characterization of the severity as mild or transient," instead finding that VASRD's 30% description was "a better fit" and that the "occupational functioning in evidence is consistent with decreased efficiency, reliability, and productivity at the time of separation and . . . 19 months after separation." Id. at 6-7. Comparing the VASRD with the standards applied by the PEB, the PDBR found that the PEB's "reliance on SECNAVINST 1850.4E for rating depressive disorder, NOS was operant in this case and the condition was adjudicated independently of that instruction by the Board." Id. at 17. In other words, the PDBR found that the PEB had not relied on

10

the VASRD in reaching its determination and therefore was unable to determine whether the decision comported with the VASRD.

The PDBR further found that "both the MEB and VA exams were complete, well documented, and similar in terms of ratable data; and, therefore assign[ed] them equal probative value." Id. at 16. The PDBR found that Ms. Brass's depressive disorder could have been rated as high as 50% when she was originally referred to the MEB in 2007, but that a 30% rating was a better fit as of June 2012. Id.

### 5. Rejection of PDBR Recommendation by Navy

On July 11, 2012, a senior medical advisor for the Secretary of the Navy Council of Review Boards ("CORB") reviewed the PDBR recommendation. Id. at 9-12. The medical advisor sent a memorandum to the Director of CORB stating that "the available evidence appears insufficient to warrant recommending the requested relief." Id. at 10-12. To come to this conclusion, the advisor reviewed the PDBR memorandum, the January 2008 PEB determination, and a December 2007 nonmedical assessment, but did not appear to consider the findings of the MEB. Id. at 10-11. The advisor further found that the VA determination from 2008 contained a "weak" explanation and stated that it "did not establish the necessary intermittent periods of inability to perform occupational tasks at the time of her discharge." Id. at 12. The advisor went on to conclude that Ms. Brass was able to maintain a job while suffering from difficulties caused by migraines. Id. The advisor also found that the most likely cause of plaintiff's issues was not depression but rather "Chronic (ACDU) Adjustment Disorder," an unratable condition which the MEB, PEB, and VA had not considered. Id.

11

On July 12, 2012, the Director of CORB sent a memorandum to the Assistant Secretary recommending non-concurrence with the PDBR recommendation, based on the review by the CORB advisor. Id. at 9. On July 24, 2012, the Secretary rejected the PDBR recommendation and maintained Ms. Brass's disability rating. On July 25, 2012, CORB informed Ms. Brass of its decision. Id. at 1.

## II. STANDARD OF REVIEW

The Tucker Act provides the court with jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Although the Tucker Act does not provide a substantive right to damages from the United States, this right has been found in the Military Pay Act, 37 U.S.C. § 204 and 10 U.S.C. § 1201. Martinez v. United States, 333 F.3d 1295, 1315 (Fed. Cir. 2003) (37 U.S.C. § 204 is money-mandating); Fisher v. United States, 402 F.3d 1167, 1174 (Fed. Cir. 2005) (10 U.S.C. § 1201 is money-mandating).
When reviewing a motion for judgment on the administrative record under Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), the court makes factual findings based on record evidence "as if it were conducting a trial on the record." See Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005). Therefore, unlike a motion for summary judgment, the existence of a disputed material fact does not preclude the court from reaching a decision. Id. at 1355. Should the administrative record be silent as to some disputed facts, the court may still render judgment if the

agency provided an adequate discussion of the bases of its decision.  See Rebosky v. United States, 60 Fed. Cl. 305, 311-13 (2004).

With regard to disability claims, the court's task is limited.  The military is afforded substantial deference in adjudicating disability claims.  Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983), and the court's role is limited to determining whether the Secretary's decision was arbitrary, capricious, unsupported by substantial evidence, or contrary to law.  Cameron v. United States, 550 F. App'x 867, 872 (Fed. Cir. 2013); Barnick v. United States, 591 F.3d 1372, 1377 (Fed. Cir. 2010).

Notwithstanding this deferential standard of review, the Navy, in this case, is still "bound to follow its own procedural regulations [once] it chooses to implement some." Murphy v. United States, 993 F.2d 871, 873 (Fed. Cir. 1993); Cameron, 550 F. App'x at 873.  Additionally, the Secretary's decision must be supported with "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Crawford v. Dep't of the Army, 718 F.3d 1361, 1365 (Fed. Cir. 2013) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

### III.   DISCUSSION

The main dispute in this case centers on whether the Navy properly rejected the recommendation of the PDBR and in particular whether the rejection was based on the application of a standard more stringent than that set in the VASRD.  Plaintiff argues that the standards applied by the Navy violate 10 U.S.C. § 1216a, which requires the criteria set by agencies for rating disabilities to be in accordance with the VASRD or less stringent.  According to plaintiff, the standard set forth in the Navy's internal guidance

with regard to "intermittent periods of inability to perform occupational tasks" by requiring proof of job loss, demotion, or inability to maintain employment, creates an impermissibly higher standard for finding a 30% disability than provided for in the VASRD and thus violates 10 U.S.C. § 1216a.  Plaintiff also argues that no reasonable mind could find that Ms. Brass is not entitled to a 30% rating under the VASRD.  In response, the government argues that the Navy properly relied on its own internal guidance in construing the VASRD and that Ms. Brass has failed to demonstrate that she would be entitled to a 30% rating even under her reading of the VASRD.

The court turns first to the legal issue of whether the Navy applied the proper legal standard in evaluating Ms. Brass' disability claim.  Under 10 U.S.C. § 1216a, the Secretary of the Navy must use the VASRD in making a disability rating, with one exception:

> In making a determination described in paragraph (1), the Secretary concerned may utilize in lieu of the schedule described in that paragraph such criteria as the Secretary of Defense and the Secretary of Veterans Affairs may jointly prescribe for purposes of this subsection if the utilization of such criteria will result in a determination of a greater percentage of disability than would be otherwise determined through the utilization of the schedule.

10 U.S.C. § 1216a(a)(2).  It is undisputed that the Navy applied its own manual in determining Ms. Brass' disability rating in 2008 and presumably in 2012 when it reviewed the PDBR's recommendation.[3]  Thus, the court must determine whether use of

---

[3] At oral argument, the government argued for the first time, and contrary to representations in its brief, that the Secretary applied only the VASRD standard when he rejected the PDBR decision.  However, the government did not identify—and the court is not aware of any—evidence in the record stating which standard the medical advisor, the Director of CORB, or the Secretary

this internal guidance comports with 10 U.S.C. § 1216a(a)(2) and the prohibition against imposing a more stringent standard than provided for in the VASRD.

The government argues that the definition in the Navy manual that it applied in this case, SECNAVINST 1850.4E, Enclosure 9, § 9011(k)(1)(b), is consistent with the VASRD and thus lawful. In response, plaintiff asserts that the manual includes more stringent criteria to establish a disability rating than provided for in the VASRD because the manual requires proof of significant job interference that is not required in the VASRD. The court agrees with plaintiff that the criteria for recommending a 30% disability rating under the Navy manual are more stringent than the VASRD; accordingly, the Navy's evaluation based on that standard cannot be sustained.

Deviation from the VASRD is only permitted by § 1216a to the extent that it results in "a greater percentage of disability" than would otherwise be available under the VASRD. Under the VASRD, a 30% disability rating is required where there is evidence of

> occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events).

---

applied in reviewing the recommendation. In this connection, given the defense presented, it is unclear why the Navy would disregard its own manual in favor of the VASRD when it reviewed the PDBR recommendation. Thus, while it is possible that the VASRD standard was applied, the court finds that it is more likely that the Navy applied its own standard in deciding to reject the PDBR recommendation.

38 C.F.R. § 4.130. Building on this standard, the Navy manual defines "intermittent periods of inability to perform occupational tasks" to require proof of actual interference with job performance "of such severity as to result in a pattern of job loss, demotion, disqualification from obtaining employment, or inability to engage in or maintain reasonable employment." SECNAVINST 1850.4E, Enclosure 9 § 9011(k)(1)(b). A pattern of job loss, demotion, or the inability to maintain employment, by its plain terms, sets a higher bar for establishing a 30% disability rating than the VASRD. While the government argues that it is possible to generally function satisfactorily but intermittently suffer from issues so severe as to cause job loss, demotion, or disqualification, the examples provided by the VASRD for a 30% rating involve far less extreme job issues. The VASRD contemplates that the person being evaluated will be "generally functioning satisfactorily," and will have only the occasional decrease in work efficiency and limited periods of work performance problems. 38 C.F.R. § 4.130. It does not require evidence of job loss, demotions or the inability to either obtain or keep a job.[4] Accordingly, this provision of the manual violates 10 U.S.C. § 1216a(a)(2).

Because it is not clear whether the Secretary's rejection of the PDBR was based on application of the VASRD alone or on the additional criteria identified in the Navy manual, the Secretary's decision must be set aside and the matter remanded for a new decision based solely on the VASRD. The court recognizes that the Secretary is not

---

[4] Additionally, it is not clear how it would be possible for a member of the Navy to demonstrate a pattern of job loss prior to separation.

required to give deference to the recommendation of the PDBR when undertaking the review on remand. However, the Secretary cannot ignore the PBDR's findings in the final decision. On remand, the Secretary must not only ensure that the VASRD is properly applied but that any rejection of the PDBR's findings are identified and supported with evidence from the record. In this connection, the court notes that the medical advisor made several errors in his recommendation to the Secretary. For example, the medical advisor stated that "[s]ubsequent VA records covering the next 1-2 years indicate an ability to sustain employment with the major occupational impairment, apparently, related to Petitioner's Migraine Headaches." AR at 12. This conclusion is contrary to the facts in the record, as the VA evaluation on which the PDBR relied clearly stated that she had lost 3 weeks of work in her current position due to her depression. Id. at 149. Further, the record demonstrates that Ms. Brass was actually unemployed for 1-2 years following her separation. Id. at 148. Similarly, the medical advisor's contention that the primary cause of Ms. Brass's problems is more likely to be "Chronic (ACDU) Adjustment Disorder" than depression is contradicted by the record. While Ms. Brass received a preliminary diagnosis of adjustment disorder, id. at 51, all of her rating decisions are based on a diagnosis of depression—a diagnosis which is not disputed by any examination of Ms Brass. Indeed the Navy gave her a disability rating based on a depression diagnosis.

    In sum, the Secretary on remand must examine the record before the PDBR, as well as all other evidence that is part of Ms. Brass's Navy record, to determine whether or

not she is entitled to a higher disability rating based on the VASRD alone, as the PDBR had recommended.[5]

IV. **CONCLUSION**

Based on the foregoing, plaintiff's cross-motion is **GRANTED-IN-PART** and **DENIED-IN-PART** and the government's motion is **DENIED**. This case is **REMANDED** to the Secretary for a period of 90 days to determine whether the decision of the PDBR to increase Ms. Brass' disability rating from 10% to 30% should be accepted based on the standard set in the VASRD.[6] Pursuant to RCFC 52.2(b), the government shall submit a status report on or before the conclusion of the 90-day remand period informing the court of the status of the remand proceedings.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[5] The parties also dispute whether the Secretary erred in seeking advice from CORB in reaching a decision. On remand, the Secretary is authorized to seek advice from the Navy's medical corps. While plaintiff argues that the Secretary is not permitted to receive a recommendation from CORB concerning the PDBR recommendation because CORB was involved in the PEB determination and therefore biased against altering the decision, the court is aware of no bar to such advice.

[6] Having remanded the matter for a new decision, the court does not have occasion to rule on Ms. Brass' objections to the PEB decisions. The court finds that her claim is moot following enactment of the Wounded Warrior Act and her right to a re-evaluation of her claim based on the standard set in the VASRD.